No. 2-09-0007    Filed: 9-16-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| FRANCES KREUTZER, MARIE CARANCI, WILLIAM BYRNE, and LINDA BYRNE, | ) ) | On Petition for Administrative Review from the Illinois Commerce Commission. |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | ICC Case No. 07--0310 |
| | ) | |
| ILLINOIS COMMERCE COMMISSION, COMMONWEALTH EDISON COMPANY, THE VILLAGE OF HUNTLEY, EXELON BUSINESS SERVICES COMPANY, NEUMANN HOMES, INC., INDYMAC BANK, F.S.B., HOWARD E. REID, and THE VILLAGE OF GILBERTS, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

JUSTICE O'MALLEY delivered the opinion of the court:

Petitioners, Frances Kreutzer, Marie Caranci, William Byrne, and Linda Byrne, appeal from the order of the Illinois Commerce Commission (Commission) granting a certificate of public convenience and necessity to respondent Commonwealth Edison Co. (ComEd) for the construction of a new electrical transmission line in McHenry and Kane Counties. The line the Commission authorized ComEd to construct would cross petitioners' property. We agree with petitioners that the evidence before the Commission does not demonstrate the need for the amount of petitioner's property that the Commission's order authorized ComEd to seek though condemnation. We therefore reverse and remand.

ANALYSIS

I. Motion to Dismiss the Appeal

On February 20, 2009, the Commission moved this court to dismiss this appeal for lack of jurisdiction. We denied the motion on March 13, 2009. The Commission renews the motion, arguing that it was not given timely notice of petitioners' petition for review in this court. The Commission points to section 10--201 of the Public Utilities Act (Act) (220 ILCS 5/10--201 (West 2008)). Section 10--201(a) states:

"(a) Jurisdiction. Within 35 days from the date that a copy of the order or decision sought to be reviewed was served upon the party affected by any order or decision of the Commission refusing an application for a rehearing of any rule, regulation, order or decision of the Commission, including any order granting or denying interim rate relief, or within 35 days from the date that a copy of the order or decision sought to be reviewed was served upon the party affected by any final order or decision of the Commission upon and after a rehearing of any rule, regulation, order or decision of the Commission, including any order granting or denying interim rate relief, any person or corporation affected by such rule, regulation, order or decision, may appeal to the appellate court of the judicial district in which the subject matter of the hearing is situated, or if the subject matter of the hearing is situated in more than one district, then of any one of such districts, for the purpose of having the reasonableness or lawfulness of the rule, regulation, order or decision inquired into and determined." 220 ILCS 5/10--201(a) (West 2008).

The specific procedures for perfecting an appeal are set forth in section 10--201(b), which states:

"(b) Pleadings and Record. No proceeding to contest any rule, regulation, decision

or order which the Commission is authorized to issue without a hearing and has so issued shall be brought in any court unless application shall have been first made to the Commission for a hearing thereon and until after such application has been acted upon by the Commission, nor shall any person or corporation in any court urge or rely upon any grounds not set forth in such application for a hearing before the Commission, but the Commission shall decide the questions presented by the application with all possible expedition consistent with the duties of the Commission. The party taking such an appeal shall file with the Commission written notice of the appeal. The Commission, upon the filing of such notice of appeal, shall, within 5 days thereafter, file with the clerk of the appellate court to which such appeal is taken a certified copy of the order appealed from and within 20 days thereafter the party appealing shall furnish to the Commission either a copy of the transcript of the evidence, including exhibits, or enter into a stipulation that only certain questions are involved, which transcript or stipulation is to be included in the record provided for in Section 10--110 [(220 ILCS 5/10--110 (West 2008))]. The Commission shall certify the record and file the same with the clerk of the appellate court to which such appeal is taken within 15 days of being furnished the transcript or stipulation. The party serving such notice of appeal shall, within 5 days after the service of such notice upon the Commission, file a copy of the notice, with proof of service, with the clerk of the court to which such appeal is taken, and thereupon the appellate court shall have jurisdiction over the appeal. The appeal shall be heard according to the rules governing other civil cases, so far as the same are applicable." (Emphases added.) 220 ILCS 5/10--201(b) (West 2008).

Finally, section 10--201(c) provides:

(c) No appellate court shall permit a party affected by any rule, regulation, order or decision of the Commission to intervene or become a party plaintiff or appellant in such court who has not taken an appeal from such rule, regulation, order or decision in the manner as herein provided." (Emphasis added.) 220 ILCS 5/10--201(c) (West 2008).

The Commission construes section 10--201 to require the party appealing a Commission decision to notify the Commission of the appeal within 35 days of the Commission's final order. The Commission sees the notification requirement as a jurisdictional prerequisite. The Commission argues that we lack jurisdiction here because the Commission issued its decision denying rehearing on December 1, 2008, but petitioners did not properly provide the Commission notice of their January 2, 2009, appeal to this court until March 2, 2009.

The Commission misreads section 10--201. The section does not require simple notification of an appeal initiated elsewhere, i.e., in the appellate court; rather, it requires that the appeal be initiated with the Commission before jurisdiction will vest in the appellate court. In Consumers Gas Co. v. Illinois Commerce Comm'n, 144 Ill. App. 3d 229 (1986), the Fifth District Appellate Court noted a conflict between section 10--201 and Supreme Court Rule 335 (155 Ill. 2d R. 335). Rule 335 establishes "[t]he procedure for a statutory direct review of orders of an administrative agency by the Appellate Court" (155 Ill. 2d R. 335) and mandates the filing in the appellate court of a "petition for review" (155 Ill. 2d R. 335(a)), which in administrative review cases serves the function of the notice of appeal required in other civil cases (People ex rel. Madigan v. Illinois Commerce Comm'n, 231 Ill. 2d 370, 388 (2008)). Rule 335(a) incorporates the timing requirements of Supreme Court Rule 303(a)(1) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 303(a)(1), eff. May 1, 2007) for the filing of a notice of appeal. 155 Ill. 2d R. 335(i)(1); County of Cook, Cermak Health

Services v. Illinois State Local Labor Relations Board, 144 Ill. 2d 326, 329-30 (1991) (hereafter Cermak) ("Rule 335 incorporates the 30-day filing period established by Rule 303(a)"). Rule 335(b) also provides that the petitioner "shall serve the petition for review on the agency and on all other parties of record to the proceedings before the agency in the manner prescribed for serving and proving service of a notice of appeal in Rule 303(c)." 155 Ill. 2d 335(b).

The Consumers Gas court found section 10--201 in "direct contravention" of Rule 335:

"Paragraph (a) of [Rule 335] requires that a petition for review shall be filed with the appellate court, unlike section 10--201(b) which requires that a notice of appeal shall be filed with [the Commission]. Paragraph (b) of the rule requires that the petitioner seeking appellate review serve a copy of the petition for review on the administrative agency and all other parties of record. In contrast, under section 10--201(b) it is the clerk of the appellate court who is served with a copy of the notice of appeal which was filed with the Commission in the first instance." (Emphasis added.) Consumers Gas, 144 Ill. App. 3d at 235.

The Consumers Gas court struck the jurisdictional provisions of section 10--201 as unconstitutional because they were an "improper legislative intrusion into the area of appellate practice by attempting to regulate the method for perfecting a direct appeal of an administrative decision." Consumers Gas, 144 Ill. App. 3d at 236. In Cermak, the supreme court held that, in appeals from orders of the Illinois Local Labor Relations Board, Rule 335, rather than section 3--103 of the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3--103), governs the time for filing an appeal. Cermak, 144 Ill. 2d 326. In reaching that conclusion, the court noted that "[t]he specific purpose for adoption of Rule 335 was to govern direct appeals to the appellate court from orders of administrative agencies." Cermak, 144 Ill. 2d at 335. The supreme court cited with approval Consumer Gas's holding (as the

supreme court summarized it) that section 10--201 is "an improper legislative intrusion into the judiciary's constitutional power over appellate procedure and practice." Cermak, 144 Ill. 2d at 338. It is not in our power to depart from Cermak.

The Commission insists that "timeliness in notifying the Commission was not considered" in Consumers Gas. We agree, but the reason Consumers Gas did not concern "timeliness in notifying the Commission" of an appeal filed elsewhere is that section 10--201 requires filing the appeal with the Commission in the first instance. According to Consumers Gas, while section 10--201(b) requires initial filing of the appeal in the Commission with notice to the appellate court, Rule 335, by contrast, requires initial filing of the appeal in the appellate court with notice to the Commission.

The Commission's only argument in support of dismissal is that it did not receive proper notice under section 10--201(b). (The Commission says: "The jurisdictional issue being raised *** is the timely notification of [petitioners'] appeal.") Contrary to the Commission's position, section 10--201(b) does not require that the Commission be given notice of an appeal filed elsewhere but, rather, that the appeal be initiated with the Commission. Hence the Commission's argument is a nonstarter. In any case, jurisdiction was vested here simply by the filing in this court of petitioners'; petition for review as required by Rule 335. "[N]o step other than the timely filing of a notice of appeal is jurisdictional" where the petitioner seeks direct review by the appellate court of a Commission decision. Moncada v. Illinois Commerce Comm'n, 212 Ill. App. 3d 1046, 1051 (1991). We again deny the Commission's motion to dismiss this appeal, and we turn to the merits.

## II. The Certificate of Public Convenience and Necessity

In an initial petition filed May 15, 2007, and an amendment filed August 14, 2007 (petition), ComEd requested from the Commission a certificate of public convenience and necessity. ComEd sought authorization to construct, operate, and maintain a new 138-kilovolt (kV) transmission line in Kane and McHenry Counties. ComEd gave the following informal description of the route for the proposed line, known as the Kreutzer Road route:

"The proposed line will begin at ComEd's existing Gilberts substation, located south of Interstate 90 near Randall Road. It will exit the substation to the northwest, following the south side of Interstate 90 for about six miles to a new substation, to be known as the Sandwald substation. From a point on the south side of Interstate 90 ***, the line will also run north, cross the tollway, and continue north following property lines to the north side of Freeman Road. It will then run west along Freeman Road, and continue north along Smith Drive, continue east along a rail spur corridor, and then southeast along the Union Pacific Railway to Kreutzer Road. East of the railroad tracks, the line will parallel Kreutzer Road south of the roadway, continuing east across Huntley-Dundee Road to connect with ComEd's existing transmission line."

ComEd described the need for the line:

"The purpose of the proposed line is to provide capacity to portions of Kane and McHenry Counties, Illinois, where electrical load has been increasing and is expected to continue to increase. This project is the third phase of an overall strategy to provide adequate and reliable electrical energy to this rapidly growing area. The first two phases were approved by the [Commission] in Docket No. 96--0410 and have been put into service already. By completing the loop of substations that includes Gilberts, proposed Sandwald,

Algonquin, and North Huntley, each of the substations in the area will be fed by two independent two-circuit lines, maintaining and enhancing reliability. The line is also necessary to power a new substation to serve the area, which ComEd will call the Sandwald Substation. Absent reinforcement, a number of existing transformers and 34 kV lines in this area would experience overloads as early as 2009. The proposed project will prevent each of these overloads by transferring the load in this area from the existing 34 kV system to the proposed transmission line. The construction of the proposed line is necessary to continue to provide adequate, reliable[,] and efficient service to these cities as well as the surrounding area."

Exhibit B to ComEd's petition was a legal description of the Kreutzer Road route. It stated in pertinent part:

"ONE PROPOSED DOUBLE CIRCUIT 138KV TRANSMISSION LINE TO BE LOCATED IN THE COUNTIES OF KANE AND MCHENRY IN ILLINOIS:

SAID TRANSMISSION LINE TO BEGIN AT COMED'S EXISTING GILBERTS SUBSTATION LOCATED ON THE SOUTH SIDE OF I90 IN SECTION 30, TOWNSHIP 42 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN IN KANE COUNTY, ILLINOIS ***.

AT A POINT ON THE *** ROUTE (SAID POINT BEING APPROXIMATELY 1/2 MILE EAST OF THE I90 and ROUTE 47 INTERSECTION), THE PROPOSED TRANSMISSION LINE WILL EXTEND NORTHERNLY ALONG THE CENTERLINE OF SECTION 16, TOWNSHIP 42 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN IN KANE COUNTY APPROXIMATELY 2,877.8 FEET TO FREEMAN

ROAD; *** <u>THENCE EASTERLY ALONG KREUTZER ROAD APPROXIMATELY 6,433.0 FEET TO THE INTERSECTION OF KREUTZER ROAD AND HUNTLEY ROAD</u> LOCATED SECTION 2, TOWNSHIP 42 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN IN KANE COUNTY ***." (Emphasis added.)

At issue in this appeal is the portion of the Kreutzer Road route that tracks Kreutzer Road, along which petitioners own property. Petitioners were allowed to intervene in the action before the Commission. In a formal position statement filed with the Commission, petitioners clarified that they had "no position on the need for the proposed transmission project" but objected only to the placement of the line on the portion of Kreutzer Road where they own property.

ComEd attached to its petition the prepared testimony of various witnesses. Ronald Dyslin, a senior real estate agent with ComEd, testified that his duties for ComEd include acquiring "real property for use as transmission rights-of-way and substation sites." He "assess[es] the type, size[,] and location of land required for any lines, substation, or facility sites." Dyslin explained why ComEd chose the south side of Kreutzer Road:

"Q. Why is ComEd proposing this alignment?

A. To the east of the railroad tracks and to the north of Kreutzer Road is an existing residential subdivision built since the approval of phases 1 and 2 of the Northwest Reliability Project, and a detention pond associated with that subdivision. The south side of Kreutzer Road is currently undeveloped.

Q. Are you aware of plans to widen Kreutzer Road?

A. We have reviewed an intergovernmental agreement among the communities in the area to the effect that Kreutzer Road will be widened to five lanes when the area south of

Kreutzer develops. I would not call these 'plans' at this time, as there is no timetable for either the development or the road project in the stretch of Kreutzer that our proposed line would parallel. So, for the time being, we are proposing to acquire <u>the necessary 50-foot right-of-way for our transmission line adjacent to the south edge of the current road right-of-way</u>. If the plans for the road development become more certain before the line must be built (which is currently projected to be 2010 or 2011), we may be able to negotiate a solution with the communities and landowners to shift our alignment."[1] (Emphasis added.)

Asked whether ComEd will need to purchase easements from every owner of land along the proposed route, Dyslin replied, "No. In some cases, the landowners from whom we need easements will depend on the exact alignment of the line."

ComEd also attached the prepared testimony of Neil Kaup, an engineer for ComEd. Kaup described the alternative routes ComEd considered before deciding on the Kreutzer Road route. Kaup referred to the following comparative table:

| Route | Description | Engineering Factors | Length (mi.) | Estimated Cost ($M) |
|---|---|---|---|---|
| I-90 and first leg north (common to all routes) | I-90 from Gilberts to Sandwald. East side of Huntley Factory Shops to Freeman Road. | Use alley-arms to stay within I-90 [right of way]; need to address or span wetlands north of tollway. | 7.1 | $13.30 |

---

[1]There is no evidence that an expansion of Kreutzer Road has ever taken place.

| Kreutzer Road (Com Ed's proposed route) | Follow property lines north across Powers Road and Smith Road; use ComEd easement through Bernat industrial park; follow Kreutzer Road to existing transmission line. | Following west property line of Stade property involves additional poles compared to straight north; tree clearing north of Powers Road; possible [e]ffect on parking lot in Bernat industrial park; one house near Kreutzer Road on south side; need to consider timing of Kreutzer Road improvements. | 4.6 | $8.75 |
|---|---|---|---|---|
| Freeman/ Galligan | Follow Freeman Road to Galligan Road; follow Galligan Road to Dundee Road; continue north along property lines to existing transmission line. | Least use of existing easements; affects the Koppie [Airport] and both runways of Reid [Airport]; need to address or span wetlands north of tollway; need to acquire extensive right-of-way from Kane Co. Forest Preserve; may need to cross back and forth to avoid existing homes in Freeman and Galligan; need to consider timing and location of Galligan Road improvements and relocation. | 4.5 | $9.19 |

| Main & Haligus | Follow property lines north across Powers Road and Smith Road; use ComEd easement through Bernat industrial park; use ComEd easement north along west side of Wing Pointe; along north side of Wing Pointe; then north to Main & Haligus. | Maximizes use of existing easements; following west property line of Stade property involves additional poles compared to straight north; tree clearing north of Powers Road; going around the south side of planned Huntley City Center would involve numerous angles and poles. | 4.3 | $8.61 |

Kaup described the advantages of the Kreutzer Road route:

"The proposed route is least cost, although it is true that the proposed route and two alternative routes are similar in cost, so among alternatives, cost is not a major determinant of the route. The Tollway right-of-way is highly advantageous, allowing rapid construction, good access, very few angle points, a direct route to the substation, and little risk as to land acquisition.

Off the Tollway, the proposed route has relatively few construction challenges. We do not expect problems with construction in wetlands, clearance problems, and will have minimal tree trimming. We parallel a railroad for a short stretch, so we will need to study the extent to which the proposed line will induce currents on the railroad, but we do not expect a problem. There is one house along the south side of Kreutzer Road that presents a conflict. Because that parcel is expected to be redeveloped in the coming years, that house would likely be sold and torn down as part of redevelopment."

Asked how the Kreutzer Road route compared to the alternatives, Kaup said:

"Each of these routes is a feasible alternative from an engineering standpoint. Compared to the proposed route, the Freeman-Galligan route requires more land acquisition from more landowners, requires substantial acquisition from the Kane County Forest Preserve District, would impact not one, but both of the Reid [Airport] landing strips, and would also impact Koppie [Airport]. Compared to the proposed route, the Main & Haligus Route would involve numerous changes of direction along the north side of the Wing Pointe subdivision to skirt the edge of the planned Huntley City Center, which would involve several large, expensive poles to accommodate sharp angles."

ComEd also included the testimony of Donnell Murphy of Arcadis, an environmental consulting firm that prepared a siting study for ComEd concerning the placement of the transmission line. Murphy described how the Kreutzer Road route compared to alternatives:

"Specific to environmental considerations, the proposed final route better optimized the use of dominant linear features having compatible associated rights-of-way. It also provided for the placement of the proposed transmission line behind planned developments rather than along a major frontage, and eliminated the potential for impacts to occur to proposed developments along Freeman and Galligan Roads that are almost exclusively residential and progressing more rapidly than planned developments in other areas. Finally, it eliminated the potential for impacts to occur to the existing and newly acquired forest preserve lands along Freeman Road."

ComEd noted that it was unable to reach agreements with some landowners for the purchase of property along the proposed line. ComEd therefore sought authorization under section 8--509 of the Act (220 ILCS 5/8--509 (West 2008)) to use "eminent domain to obtain the necessary right-of-way."

The Commission staff endorsed the Kreutzer Road route. The Commission staff filed the testimony of Greg Rockrohr, a staff engineer with the Commission. Regarding the comparative costs of the route options, Rockrohr said:

"ComEd indicated that of the three routes, the highest cost route, Freeman/Galligan, would cost less than 7% more than the lowest cost route, Main & Haligus. Since the error within each of ComEd's cost estimates is more than 7%, the estimated costs for ComEd's three final route alternatives can be considered equal for discussion purposes, so that cost was not a significant factor when choosing one route over another."

The Village of Huntley (Huntley) also intervened in the action before the Commission. Huntley claimed that there are planned commercial and residential areas in Huntley on which the Kreutzer Road route would impinge. Huntley proposed a modified version of the Freeman-Galligan route. This modified Freeman-Galligan route would avoid Huntley but traverse property owned by Neumann Homes, a developer with plans to build a subdivision called The Conservancy on the land. There was evidence that The Conservancy was platted and partially built. There was also evidence that the modified Freeman-Galligan route would traverse land owned by the Kane County Forest Preserve District, specifically, the Freeman Kame-Meagher Forest Preserve.

Petitioners presented the testimony of Donald Byrne. Byrne stated that petitioners own 265 acres on Kreutzer Road, with 40 acres on the north side of the road and the remainder on the south side. All but a small portion of the land is currently farmed. Petitioners have homes on both sides

of Kreutzer Road. Byrne testified that portions of petitioners' farm have been in the Kreutzer family since 1868, and the rest since 1891, and that the farm has been certified as a Centennial Farm under the Illinois Department of Agriculture's Centennial Farm Program. Byrne testified to the detriment he believed the property would suffer if ComEd installed its line:

"I realize that the actual acreage permanently taken out of farm production will be relatively small. But during the construction phase the farming operations will be significantly interrupted. More importantly, however, the structures and lines will constitute a permanent intrusion upon the Farm. The Farm's character will be forever and significantly degraded by the presence of such a highly visible, man-made conglomeration of steel and wire. The structures and lines will contrast sharply with the natural farm landscape that exists, and has existed, for such a long time. The fact that the State has conferred the special, centennial farm designation on Kreutzer Farm just exacerbates the adverse impact of the project in such close proximity, when it is not necessary to do so."

ComEd presented the rebuttal testimony of Rockrohr, who questioned the feasibility of the modified Freeman-Galligan route because it would traverse the property of a forest preserve district, against which, Rockrohr believed, eminent domain proceedings are not available. The Commission staff agreed with this position.

Huntley presented the rebuttal testimony of Donald Robinson, a consultant in the area of utility line placement. Robinson testified that it is a "common practice to deviate from a tangent line in order to avoid sensitive areas and mitigate negative impacts." Robinson stated that, "[i]n [his] experience, it is commonplace for a utility to introduce minor variances when the actual design is engineered to handle the real-world conditions for placing its transmission facilities." Robinson

believed that, "[b]y making a very few minor adjustments to the tangent alignment, the Modified Freeman-Galligan Route could avoid a major portion of the negative impact" on forest preserve lands. Specifically, Robinson believed that ComEd could situate the line just east of the tree line of the preserve without having to clear any trees on the preserve itself. Robinson noted that it is "important to bear in mind that even a 50' right of way does not require a 50' swath of complete vegetation clearance."

ComEd presented the surrebuttal testimony of Dyslin, who testified:

"Q. Huntley witness Robinson suggests that ComEd can construct the line east of the Powers Road trees ***. What comment do you have from a real estate perspective?

A. The trees are on forest preserve property. ComEd understood that Huntley was proposing the line east of the trees. However, we cannot simply buy a 50-foot easement east of the trees without paying for the land containing the trees as well. Our 50-foot easement would abut at least a 40-foot wide strip, containing the trees, east of the centerline of Powers Road. So along the corridor, we would need to factor in the cost to obtain the entire 90-foot (at a minimum) width. Again, we'd have to pay whatever the forest preserve wanted to charge."

On January 30, 2008, the proofs were closed and the administrative law judge (ALJ) marked the record "Heard and Taken." On July 11, 2008, the ALJ filed a proposed "order and certificate of public convenience and necessity" authorizing ComEd to install the transmission line along the proposed Kreutzer Road route. Appendix 1 to the proposed order adopted verbatim Exhibit B, the legal description attached to ComEd's petition. The ALJ set deadlines of August 8, 2008, for briefs on exceptions and August 22, 2008, for reply briefs on exceptions.

On August 8, 2008, petitioners filed a "Motion to Take Administrative Notice Instanter." Petitioners represented that, on June 10, 2008, the Kane County Board passed a resolution designating petitioners' house on the south side of Kreutzer Road (the Kreutzer House) a "Kane County Historic Landmark." Section 16--94(a) of the Kane County Code (County Code) (Kane County Code §16--94, amended July 7, 2000) provides that a "certificate of appropriateness" shall be obtained from the Kane County Preservation Commission "before any significant alteration, construction, demolition or removal that affects pending or designated landmarks, preservation districts[,] and road corridors is undertaken." Petitioners argued that the landmark designation significantly impacted the analysis of the proper route for ComEd's line:

"[Section 16--94(a) of the County Code] *** require[s] *** local county approval and present[s] an obstacle to property acquisition along the Kreutzer Road portion of the transmission line route, just as the Freeman Kame Forest Preserve may present an easement acquisition challenge to ComEd along the Modified Freeman-Galligan route. It is reasonable to conclude that either route presents the same easement acquisition challenge over a portion of the route for which eminent domain authority may not be available."

Also on August 8, 2008, petitioners filed their brief on exceptions. Petitioners argued that the proposed order wrongly concluded that the Kreutzer Road route was the least-cost option.

On September 2, 2008, the ALJ denied petitioners' motion to take administrative notice. The record contains no remarks from the ALJ himself concerning the reasons for the denial, but in its final order of October 8, 2008, the Commission summarized the ALJ' s reasons for the denial:

"First, the ALJ noted that the record in this matter was marked 'Heard and Taken' on January [30], 2008. [Petitioners] did not seek this designation of their farm property until March

2008. The Kane County Board did not act on the motion until June 10, 2008. The ALJ reasoned that this presented due process problems and it would be prejudicial to the other parties in this matter to allow this into the record without the opportunity to question the relevance of the designation. Moreover, he ruled that this designation does not supersede the authority of this Commission under the Public Utilities Act. Finally, because the exact location of the proposed transmission line has not been set, the route could still be positioned along Kreutzer Road, thereby avoiding any encroachment on the portion granted historic designation."

ComEd did not file its own exceptions but on August 22, 2008, filed a reply to petitioners' exceptions. As to the landmark designation of the Kreutzer House, ComEd wrote:

"As Huntley's witness Mr. Robinson testified, when a utility designates its alignment, it can use minor adjustments to avoid particular features. [Citation.] In this case, ComEd could simply align the line to the south side of the house if necessary. This would avoid any need to alter the designated building. To make clear that ComEd may parallel Kreutzer Road on the south side of the Kreutzer farmhouse, ComEd suggests that the [Commission] specifically allow such an alignment. Attached to this brief is a suggested addition to Appendix 1 to the order making this clear."

ComEd attached a proposed Appendix 1 with the suggested modifications bolded and underscored as follows:

"AT A POINT ON THE *** ROUTE (SAID POINT BEING APPROXIMATELY 1/2 MILE EAST OF THE I90 and ROUTE 47 INTERSECTION), THE PROPOSED TRANSMISSION LINE WILL EXTEND NORTHERNLY ALONG THE CENTERLINE OF SECTION 16,

TOWNSHIP 42 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN IN KANE COUNTY APPROXIMATELY 2,877.8 FEET TO FREEMAN ROAD; *** THENCE EASTERLY ALONG KREUTZER ROAD **WITHIN 175 FEET OF THE CENTERLINE OF THE ROAD RIGHT-OF-WAY FOR A DISTANCE OF** APPROXIMATELY 6,433.0 FEET TO THE INTERSECTION OF KREUTZER ROAD AND HUNTLEY ROAD LOCATED SECTION 2, TOWNSHIP 42 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN IN KANE COUNTY ***." (Emphasis in original.)

On October 8, 2008, the Commission issued its final "order and certificate of public convenience and necessity." The Commission applied the criteria of section 8--406(b) of the Act (220 ILCS 5/8--406(b) (West 2008)) governing the issuance of certificates of public convenience and necessity. The Commission noted that there was no dispute among the parties that a new transmission line was necessary for ComEd to maintain adequate, reliable, and efficient service to its customers. Rather, the Commission noted, the issue was the placement of the line. Turning to that issue, the Commission first determined that the Kreutzer Road route was the least-cost option. Specifically, the Commission said:

"ComEd presented evidence that its proposal is the least-cost means of meeting the area's needs. It presented the results of a detailed engineering study of practical alternatives. The study confirmed that the next-best alternative would cost approximately twice as much as its proposal."[2]

_____

[2]We are unsure of the source for the latter remark. The Commission did not identify this "next-best alternative" that would cost "approximately twice as much as [ComEd's] proposal." There

As to the modified Freeman-Galligan route proposed by Huntley, the Commission said:

> "First, it is clear under Illinois law [that] the Kane County Forest Preserve District cannot be compelled to convey any interest in the Freeman Kame-Meagher Forest Preserve through eminent domain or condemnation. *** [T]hus, even if cost questions did not exist, the [Commission] would have grave reservations about ordering ComEd to use the route, in light of the fact that ComEd may be unable to obtain necessary easements even with eminent domain authority. Huntley offers no solution whatever to this problem.
>
> Further, despite asserting that the Modified Freeman-Galligan Route would be least-cost, Huntley does not proffer any evidence to support such claims. Moreover, no party can predict what ComEd would have to pay to acquire property rights in the Freeman Kame-Meagher Forest Preserve, even if it were to prove able to do so. *** The indefinite cost of the Modified Freeman-Galligan Route makes it difficult for us to approve it. In our view, the Modified Freeman-Galligan route, which would cut through the middle of a forest preserve, a partially constructed housing development, and would place poles in the front yards of existing homes, is not superior to ComEd's proposed route. While development is planned for areas along the Kreutzer Road route, the Commission finds that those future

was no such margin of cost among any of the alternatives in the table to which Kaup referred. Kaup noted that costs among the alternatives were "similar" and that cost was not a "major determinant" of ComEd's selection of the Kreutzer Road route. In any event, since we are reversing the decision of the Commission on a different ground, we need not determine the comparative costs of the routes proposed by the parties.

developments would not have the negative effect likely to be caused by traversing The Conservancy, which already has been platted and partially constructed."

As for petitioners' objections to the Kreutzer Road route, the Commission said:

"While the [Commission] appreciates the Centennial Farm status achieved by the Kreutzer Farm, such status nevertheless cannot be a determining factor in where to route a transmission line that is needed for the surrounding community. The future plans for Kreutzer Road to become a 5-lane, primary arterial further weakens [petitioners'] argument that a transmission line alone will alter the character of the farm."

The Commission further found that ComEd was capable of financing the project and of managing and supervising the construction.

Pursuant to sections 8--503 and 8--509 of the Act (220 ILCS 5/8--503, 8--509 (West 2008)), the Commission authorized ComEd to bring an eminent domain action to acquire property for the transmission line. The Commission said:

"The proposed project has been demonstrated to be necessary and to serve the public convenience. The evidence shows that ComEd has tried diligently to acquire the right-of-way necessary for the project, but so far has been unable to do so. The record clearly shows that if the public in this area is to continue to receive adequate, efficient and reliable service at the least-cost means, this project must be constructed."

Appendix 1 to the Commission's order was a verbatim copy of ComEd's proposed Appendix 1. The Commission granted "ComEd authority to assert eminent domain authority as necessary to construct the route described *** in Appendix 1."

On November 7, 2008, petitioners filed an application for rehearing. Petitioners objected to the Commission's accession to ComEd's request, in its reply on exceptions, that it be authorized to place the transmission line within a range of 175 feet from the centerline of Kreutzer Road. Petitioners argued that there was no evidence to support this revision. Petitioners noted that whenever ComEd proposed in its evidence before the Commission a specific width for the right-of-way on Kreutzer Road, as in the testimony of Dyslin, it mentioned only a 50-foot right-of-way adjacent to Kreutzer Road.[3] Petitioners argued that ComEd's calculation of cost was evidently based on a 50-foot width and that a 175-foot width might have implications for the cost analysis that were not explored in the proceedings:

> "[T]he filed testimony and exhibits, live testimony and cross-examination, briefs, and the ALJ Proposed Order, all contemplated a proposed route along Kreutzer Road that was to be within a 50-foot wide easement adjacent to the south side of the road and near the edge of the Kreutzer Farm, as ComEd had petitioned and supported. Because no one had even suggested a location intruding any further into the Kreutzer Farm, let alone up to 125 feet further, no party offered any evidence of the geographic features within that additional area, sensitivities, or other factors that may impact the location of the line in that area. *** Therefore, we do not know how this new 'Modified Kreutzer Road Route' would stack up in an analysis comparing it to the other routing alternatives."

---

[3]In addition to Dyslin's testimony, petitioners point to ComEd's exhibit 8.1, referenced in the rebuttal testimony of Murphy. The only copy of exhibit 8.1 that we have found in the record is illegible.

Petitioners attached an affidavit from Byrne, who averred that the portion of petitioners' property within 175 feet of the centerline of Kreutzer Road includes various buildings and wildlife habitat. Petitioners asked the Commission to open the record for further proceedings to determine the impact of the widened right-of-way.

On November 20, 2009, the ALJ recommended to the Commission that it deny the application for rehearing. The ALJ reasoned:

"In ComEd's response to [petitioners' motion to take administrative notice], the Company suggested that the utility could use minor adjustments to avoid particular features. ComEd could just align the line to the south of the house if necessary. So the Company proposed the additional change to help the property listed in the historical designation. The change was from 50 feet to 175 feet. This will give ComEd more leeway when the final alignment is determined.

* * *

This change was made to help [petitioners] and ComEd work on a final alignment that would avoid the property contained in the historical designation. Just because the width was extended from 50 feet to 175 feet[] does not mean that the Company will use the whole area. It gives the construction engineers more flexibility to refine the final alignment thus avoiding potential problems. The route will remain the same and the final alignment will be made by the construction engineers for ComEd. Therefore, it will not really serve any purpose to rehear this issue, since the final alignment will be determined during construction and not in this hearing."

The Commission adopted the ALJ's recommendation and, on December 1, 2008, denied petitioners' application for rehearing.

On appeal, petitioners raise three arguments. First, they claim that the Commission erred when, after the proofs were closed, it authorized ComEd to align the transmission line within 175 feet of the centerline of Kreutzer Road, when ComEd's witnesses, such as Dyslin, indicated only that ComEd needed a 50-foot-wide right-of-way adjacent to Kreutzer Road. Relatedly, petitioners suggest that the Commission may have violated the Open Meetings Act (5 ILCS 120/1.01 et seq. (West 2008)) in that, given the late insertion of the reference to the 175-foot margin, "there may have been input from some source other than the record." Second, they argue that the Kreutzer Road route was not the least-cost route for the proposed line in any case, and that the widening of the easement beyond that contemplated by ComEd's witnesses exacerbated the failure of proof. Third, they argue that the Commission was wrong to deny their request to take administrative notice of Kane Country's designation of the Kreutzer House as a historical landmark.

ComEd and the Commission both claim that petitioners forfeited some of these arguments. Section 10--113(a) of the Act (220 ILCS 5/10--113(a) (West 2008)) states:

"No appeal shall be allowed from any rule, regulation, order or decision of the Commission unless and until an application for a rehearing thereof shall first have been filed with and finally disposed of by the Commission ***. No person or corporation in any appeal shall urge or rely upon any grounds not set forth in such application for a rehearing before the Commission."

"It is incumbent upon the party seeking review to specify in a petition for rehearing where the Commission erred so as to allow it an opportunity to correct the error [citation], and the allegations

in the petition must be sufficiently specific to apprise the Commission and opposing parties of the actual points relied upon [citations]." Village of Montgomery v. Illinois Commerce Comm'n, 249 Ill. App. 3d 484, 491(1993); see also Citizens Utility Board v. Illinois Commerce Comm'n, 166 Ill. 2d 111, 135-36 (1995) (court will consider no argument not specifically brought before the Commission).

We agree with ComEd and the Commission that petitioners' argument for rehearing on the issue of the least-cost option was significantly narrower than the argument they now bring on the issue. We note first that petitioners did not question below, and do not question here, the general need for the transmission line. They challenge only the Commission's preferred layout for the line, the Kreutzer Road route. In arguing that specific point here, petitioners contend that the evidence before the Commission does not demonstrate that the Kreutzer Road route is the least-cost option either with a 50-foot corridor adjacent to Kreutzer Road, as Dyslin contemplated, or with the revised range of up to 175 feet from the centerline of Kreutzer Road. In their application for rehearing, however, petitioners objected only to ComEd's attempt to secure a right-of-way wider than 50 feet. Petitioners thus forfeited their challenge that the Kreutzer Road route was not the least-cost option, given a right-of-way of no wider than 50 feet adjacent to Kreutzer Road. Thus, we do not review whether the Kreutzer Road route was the least-cost option as laid out before the revision that ComEd prompted.

Petitioners also forfeited their argument that the Commission erred by declining to take administrative notice of the designation of the Kreutzer House by Kane County. In their application for rehearing, petitioners mentioned the Commission's denial of the motion but did not assign error to it.

We turn to petitioners' one preserved contention, that there was no evidence before the Commission to demonstrate the need for a 175-foot right-of-way reckoned from the centerline of Kreutzer Road or, for that matter, any right-of-way more expansive than a 50-foot corridor adjacent to Kreutzer Road. Here we note that petitioners assume that Appendix 1 to the Commission's order allows ComEd to acquire up to 175 feet of land from the centerline of Kreutzer Road. The order provides for a "TRANSMISSION LINE" to run "EASTERLY ALONG KREUTZER ROAD WITHIN 175 FEET OF THE CENTERLINE OF THE ROAD RIGHT-OF-WAY." This appears to contemplate that the transmission line will be located somewhere within 175 feet from the centerline of the road. At oral argument, ComEd insisted that the order simply allows it to position, somewhere within 175 feet of the centerline of Kreutzer Road, the 50-foot right of way referenced by Dyslin. The description itself, however, specifies neither the width of the transmission line nor the additional right-of-way, if any, necessary to place the line, and hence the language poses no bar to ComEd using, if needed, a whole 175-foot corridor reckoned from the centerline of Kreutzer Road. Notably, in commenting that "[j]ust because the width has been extended from 50 feet to 175 feet[] does not mean that [ComEd] will use the whole area," the ALJ did not reassure petitioners that the right-of-way, wherever placed, would not exceed 50 feet in width.

We agree with petitioners that the Commission's order was deficient. To explain, we set forth the procedures under the Act for a utility to acquire the Commission's approval for a project and its authorization to use the condemnation power to acquire property for the project.

Section 8--406(b) of the Act provides that, before a public utility may undergo "the construction of any new plant, equipment, property or facility which is not in substitution of any existing plant, equipment, property or facility or any extension or alteration thereof or in addition

thereto," the utility must obtain from the Commission "a certificate that public convenience and necessity require such construction" (220 ILCS 5/8--406(b) (West 2008)).  A certificate of public convenience and necessity authorizing the proposed construction will issue:

"only if the utility demonstrates: (1) that the proposed construction is necessary to provide adequate, reliable, and efficient service to its customers and is the least-cost means of satisfying the service needs of its customers or that the proposed construction will promote the development of an effectively competitive electricity market that operates efficiently, is equitable to all customers, and is the least cost means of satisfying those objectives; (2) that the utility is capable of efficiently managing and supervising the construction process and has taken sufficient action to ensure adequate and efficient construction and supervision thereof; and (3) that the utility is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." 220 ILCS 5/8--406(b) (West 2008).

Section 8--503 of the Act provides in relevant part:

"Whenever the Commission, after a hearing, shall find that additions, extensions, repairs or improvements to, or changes in, the existing plant, equipment, apparatus, facilities or other physical property of any public utility or of any 2 or more public utilities are necessary and ought reasonably to be made or that a new structure or structures is or are necessary and should be erected, to promote the security or convenience of its employees or the public or promote the development of an effectively competitive electricity market, or in any other way to secure adequate service or facilities, the Commission shall make and serve an order authorizing or directing that such additions, extensions, repairs, improvements

or changes be made, or such structure or structures be erected at the location, in the manner and within the time specified in said order ***." 220 ILCS 5/8--503 (West 2008).

Only the State has inherent power to condemn property for public use, but the State may delegate that power to municipalities and private corporations such as railroads and utilities. Illinois Power Co. v. Lynn, 50 Ill. App. 3d 77, 78 (1977). Under section 8--509 of the Act, the Commission may authorize a utility to file condemnation proceedings to acquire property for specific improvements approved under section 8--503. Section 8--509 states:

"When necessary for the construction of any alterations, additions, extensions or improvements ordered or authorized under Section 8--503 *** of this Act, any public utility may enter upon, take or damage private property in the manner provided for by the law of eminent domain." 220 ILCS 8--509 (West 2008).

In two cases, Lynn and Albin v. Illinois Commerce Comm'n, 87 Ill. App. 3d 434 (1980), the appellate court described the relationship between section 55, section 50, and section 59 of the Act (in Albin, Ill. Rev. Stat. 1977, ch. 111 2/3, pars. 56, 50, 59; in Lynn, Ill. Rev. Stat. 1973, ch. 111 2/3, pars. 56, 50, 63), now sections 8--406, 8--503, and 8--509 of the Act, respectively. In Lynn, the court drew an analogy between the grant of condemnation power to a municipality and the grant of such power to a utility:

"[I]f a city seeks to build a public building for a public use on privately owned property, the city council will appoint a commission to explore the needs and develop plans. Public hearings may be held. Recommendations are then made to the city council which enacts an ordinance. The statement of public use and the required area of land are set out in the ordinance. Condemnation proceedings follow." Lynn, 50 Ill. App. 3d at 78.

Lynn observed that this "basic pattern" is followed in the Act:

"[Section 8--406] provides that no utility shall begin the construction of a new plant or facility without first obtaining a certificate of convenience and necessity.  [Section 8--503] provides after a hearing the Commission shall made [sic] and serve an order authorizing the structures to be erected on the location in the manner and within the time specified.

[Section 8--509] authorizes the utility, armed with the certificate and order, to use the power of eminent domain through the courts to acquire the land necessary for the project."

Lynn, 50 Ill. App. 3d at 79.

We develop the analogy further.  "The law is also clear that the property to be condemned must be reasonably described in the enabling action of the condemnor, be it an ordinance or a resolution, and the failure to so describe is fatal to the petition to condemn."  Illinois State Toll Highway Authority v. DiBenedetto, 275 Ill. App. 3d 400, 405 (1995); cf. 735 ILCS 30/10--5--10(a) (West 2008) (complaint by municipality to condemn property "shall set forth *** a description of the property").  It has been alternatively stated that there must be "reasonable certainty" in the description of the property sought to be condemned (City of Chicago v. Arnold, 261 Ill. 142, 146 (1913)).

For instance, in City of Rockford v. Rockford Life Insurance Co., 16 Ill. 2d 287, 288-89 (1959) (Rockford Insurance), the enabling ordinance recited Rockford's intent to extend an existing street and to seek condemnation of the defendant's property for that purpose.  The supreme court held that the ordinance was formally deficient because it did not specify which part of the defendant's property was sought.  That is, the ordinance did not state whether the existing street was to be extended in the same direction or at some other angle.  Moreover, though the ordinance sought an

80-foot strip of the defendant's land, the existing street was only 50 feet wide. Rockford Insurance, 16 Ill. 2d at 288-89.

We think that, like an ordinance enabling a municipality to seek certain property by condemnation, a section 8--406/8--503/8--509 order, which authorizes the making of certain improvements and the initiating of eminent domain proceedings to acquire the necessary property, must describe with reasonable certainty the portion of the property sought to be condemned. As Lynn notes, the inquiry under sections 8--406, 8--503, and 8--509 concerns "the proposed plan for development of the project and the extent of the property to be sought" (emphasis added) (Lynn, 50 Ill. App. 3d at 82).

An authorization for condemnation must also have an adequate evidentiary basis. The appellate court in Albin explained that sections 8--406, 8--503, and 8--509 require distinct showings of necessity. Section 8--406 requires necessity for the project in general, i.e., here (as in Albin) the provision of "more reliable electrical service" to the subject area; section 8--503 requires necessity for "the additions and improvements to implement the more reliable service"; and section 8--509 requires necessity for the "means of obtaining easements for right-of-way for the additions and improvements." Albin, 87 Ill. App. 3d at 439. An authorization for condemnation may issue only upon evidence justifying the "proposed plan for development of the project and the extent of the property to be sought." Lynn, 50 Ill. App. 3d at 82.

With this backdrop, we turn to petitioners' argument. Petitioners argue that the evidence before the Commission did not support revising its proposed order to allow ComEd to acquire along the south side of Kreutzer Road a right-of-way of up to 175 feet from the centerline of the road. Petitioners argue that ComEd's claimed justification for the revision, that it would allow ComEd the

flexibility to position the transmission line so as to avoid the features of historical value on petitioners' property, begged the question of why a margin of 175 feet was necessary rather than some other margin.

We agree. First, apart from the issue of evidentiary support, the Commission's order does not adequately describe the portion of property ComEd is authorized to seek. The order provides for a "TRANSMISSION LINE" to run "EASTERLY ALONG KREUTZER ROAD WITHIN 175 FEET OF THE CENTERLINE OF THE ROAD RIGHT-OF-WAY." This description is even more tentative than the description found wanting in Rockford Insurance. There, the ordinance declared Rockford's intent to seek an 80-foot corridor from the defendant but did not specify which 80 feet. Here, the description does not even venture to identify a size for the portion of land to be taken from petitioners, much less specify from where on petitioner's property that portion would be taken. Instead, it allows for placement of a transmission line of unidentified width within a range of well over 100 feet (even allowing for a substantial width for the road right-of-way) on petitioners' property. Moreover, as ComEd acknowledged at oral argument, the order does not even specify on which side of Kreutzer Road ComEd must place the line.

Second, even if such an uncertain description were sufficient, the record does not support a margin of 175 feet from the centerline of Kreutzer Road (in whichever direction) rather than some other margin. The Commission's decision had to be supported by substantial evidence, which is "evidence that a reasonable person would accept as sufficient to support a certain conclusion." Ameropan Oil Corp. v. Illinois Commerce Comm'n, 298 Ill. App. 3d 341, 347 (1998). There was literally no evidence to explain why ComEd sought in particular a margin of 175 feet from the centerline. Also, it is unclear from the record whether ComEd believed it might have a need for the

whole 175 feet from the centerline. Though Dyslin testified early in ComEd's case that it needed only a 50-foot right-of-way for the transmission line, ComEd in urging the revision to the Commission's proposed order did not specify any width for the line. If ComEd's intent was simply to request a range in which to place a transmission line of a certain width, then it is notable that ComEd did not commit itself to a specific width for the line in requesting the range. This would have assured petitioners that, no matter where the line was placed, ComEd would take a certain amount of property and nothing more.

The Commission and ComEd make various points whose common thread is that ComEd did not need to specify the actual width of the right-of-way along Kreutzer Road, because the dimensions could properly be determined later. ComEd believes that the "precise alignment in the right-of-way along Kreutzer Road" can be determined during construction of the transmission line. For support, ComEd points to Robinson's testimony that it is the "common practice" of utilities to "deviate from a tangent line in order to avoid sensitive areas and mitigate negative impacts."

The Commission, for its part, admits that the width of the right-of-way along Kreutzer Road was "not raised to the Commission as any evidentiary matter," but the Commission maintains that there is "no law which requires that the limitation proposed by ComEd be presented as an evidentiary matter" before the Commission. Rather, petitioners and ComEd "will either negotiate the placement of this transmission line on [petitioners'] property or, under the worst case scenario, a court in condemnation will make that determination." The Commission goes so far as to suggest that, since it was unnecessary for ComEd to propose, or the Commission to authorize, a specific width for the right-of-way, ComEd's suggestion that it locate the line within 175 feet of the centerline was a voluntary limitation, to which "only ComEd can object."

-32-

These arguments all fail. As the authorities discussed above show, the Commission's order had to describe with reasonable certainty the amount of land it authorized ComEd to acquire, and that description had to be supported by substantial evidence. Hence we see as fundamentally misconceived the Commission's suggestion that the description in its order did not need "to be supported by evidence." As for ComEd's points, we recognize that a utility, in proceedings before the Commission, might not yet be able to foresee a route for its line with certainty. We need not determine to what extent the Commission may accommodate a utility's uncertainty, for here ComEd made no attempt to explain why it needed a range of 175 feet in particular to make adjustments.

The Commission believes we must excuse any laxity in the proceedings before it in this case. The Commission cites section 10--101 of the Act (220 ILCS 5/10--101 (West 2008)), which provides:

> "[N]o informality in any proceeding or in the manner of taking testimony before the Commission, any commissioner or hearing examiner of the Commission shall invalidate any order, decision, rule or regulation made, approved, or confirmed by the Commission in the absence of prejudice."

It seems the reason the Commission believes there is no prejudice to petitioners is that they will have an opportunity to argue before the condemnation court what specific portion of their property, if any, they believe ComEd may acquire. We think the prejudice to petitioners would lie in subjecting them to the trouble and expense of additional proceedings for ComEd to prove what it already should have proven.

As to how to proceed from here, ComEd prefers that we simply direct the Commission to delete the reference to the 175-foot width rather than "remand for further proceedings on whether

the 175-foot provision should be included." The Commission, however, "will accept remand to either hear evidence on the matter or to strike the 175 foot limitation out of the legal description." Petitioners request a remand to "reopen the hearing" but give no specifics.

We do not opt simply to have the 175-foot reference stricken. That would eliminate all measure of definiteness in the width of the right-of-way sought by ComEd and render the Commission's decision entirely out of compliance with the standards we set forth above. Notably, neither ComEd nor the Commission asks us to hold that the evidence at least supports a 50-foot right-of-way adjacent to Kreutzer Road, as described by Dyslin. We could not do so anyway because Appendix 1 to the Commission's order does not specify a 50-foot right-of-way. We simply remand this matter for further proceedings before the Commission, governed by the principles set forth above.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the Commission and remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

JORGENSEN and HUDSON, JJ., concur.